United States Court of Appeals for the Ninth Circuit is now in session. Please be seated. Good morning and welcome to the Ninth Circuit Court of Appeals. My name is Morgan Christen. I'm one of the judges on the Circuit Court. My chambers are in Anchorage, Alaska. I'm delighted to be sitting this week with Judge Berzon, whose chambers are in San Francisco, and Judge Tallman, whose chambers are in Anchorage. We're going to have four arguments today. We don't have submitted cases, so we'll proceed to the first case on the calendar. It'll take me just a minute to get set up, but I'll call the case so you can be coming to the podium. It's Wakefield v. ViSalus, 21-35201. Okay, I'm all set. Good morning, Your Honors. May it please the Court, Becky James on behalf of the appellant, ViSalus, Inc. With me at counsel table is Ryan Vanover from my firm, who also was with me on the briefs. I'd like to reserve approximately three minutes for rebuttal. Just keep track of your time, thank you. I'd like to begin by making clear what this case is not. This is not a typical TCPA case about cold calling. Those annoying phone calls you get offering to you don't want and never asked for. This is not a case about calls made to randomly generated phone calls, phone numbers. This is not a case where individuals got phone calls they didn't ask for. This is a case where a defendant ViSalus made phone calls only to its own customers and sales representatives. So could I stop you there, because I understand this and we've read your briefs carefully. It is a unique case, for sure, but I don't think you're, there's a liability finding by a jury. I'm sorry, I didn't understand. There's a liability finding by a jury, and so you are where you are post-judgment. What's your strongest argument today? I think the strongest argument is the lack of standing in light of transunion. I do think that transunion really changed the the waterfront here in terms of standing, and this case is a classic example of where concrete harm is lacking. I would also point out, first of all, we have the Van Patten case. Yes. You have to be claiming, you have to be, your contention has to be that Van Patten is no longer good law, is that right? It's undermined. So Van Patten just held, so a couple of points on Van Patten. Van Patten was before transunion, so I do think, you know, that's right. We're asking the question, yes. So Van Patten, and I would not say even Van Patten, though, does not undermine our claim here, because they weren't analyzing the same kind of claim. What Van Patten addressed was the broad point that an unwanted phone call is an intrusion, is concrete enough. Can I ask you a question about that? Did your client actually produce the application forms in which people put their phone number on it? Was that before the jury? What was before the jury was by the plaintiffs, actually. They put in evidence from deposition testimony. That wasn't my question. I wanted to know if your client produced the actual application. Could they find them, is really what I'm asking. Yes, yes, the applications were there. When you say were there, this is important to me. In my scorecard, I think opposing counsel argues that there was difficulty getting these in discovery, and that the reason for that was that your client took the position that they weren't going to argue consent. Right. So going back to Judge Talmadge's question. We're on the same wavelength here. As I read the record, your client, for whatever reason, did not produce reams of employment applications, either because they didn't think consent was at issue, or they couldn't find them. So how do we know that from that dearth of evidence, that the jury's finding that the calls were unsolicited is supported or refuted by the record? Actually, the jury didn't find that they were unwarranted or unsolicited. They found that they weren't. Wasn't the jury instructed on the elements of the civil cause of action? Not the consent. Consent was actually taken away from the jury, and they were, because Vaisalas had admitted that they didn't meet the new rule in 2013, and didn't have the language that would satisfy prior express written consent, because they didn't disclose. But isn't that a concession, that your client could not establish consent? They couldn't establish the 2000, compliant with the 2013 rule. Right. But that's different. That's different. We understand it's different, but you know, we are where we are with this, and there was, you know, an application for the waiver, and that was new news to the district court judge, and so I'm really, I'm struggling with how you expect post-judgment for the district court to turn back the hands of time on all these decisions that were made along the way. Well, and that's the second issue, but yes, as to the FCC waiver, it was expressly retroactive, so it did change a lot. The issues are closely related, because you're beginning with the premise that there was consent and the standing, and then your standing argument depends on the consent point, doesn't it? In a sense, yes, and I do think consent and standing intersect in an interesting way in this case, and all these cases. If you weren't arguing lack of consent on the merits, then how does it come into the standing? The reason it's a standing issue is because standing depends on these phone calls being unwanted. The plaintiffs bear the burden on standing of showing the injury, and they didn't show that here. But your client expressly disclaimed that it was relying on consent, so why would the jury be precluded from determining that the statute was violated because there was no consent to receive these calls? Because of the timing of that rule, and what happened was... The FCC rule. Yes, the FCC rule, and I realize it's a little bit complicated, but... No, no, I think we follow the argument. So, but what happened was, Bysalis didn't waive its consent for, not the consent of, that we didn't make phone calls, we only made phone calls to people who asked for them on their form. They never waived that. In fact, plaintiffs repeated that. I don't know if I can, if I can read consent as narrowly as you're trying to define it. Right there, you know, you've argued that now, and we understand that argument clearly in the briefs, but going back to what the argument was made to the district court at the time he said in the trial that this has been waived, was this distinction that you're making now made then? Yes. I don't see any record cite to that, so maybe when you come back you can show us where that distinction, because it really seems to me like you're expecting, I don't mean to be casting aspersions, but the district court doesn't, he's not a mind reader, and I'm very interested to see if that distinction was drawn out to him then. And then your client made a motion to amend its answer to include consent, but then withdrew it and told the district court we're not relying on consent. Right. And that's the state of the record. Right, but what you have to understand with the, on the consent issue, is they had no choice at that time. They didn't have the FCC record waiver at that time. But if you're not relying on consent for that purpose, then how does it come into the standing notion? In other words, the case was, was, the plea was that this was unsolicited and unconsented to, and you didn't dispute that. So on, on the complaint and as the case was litigated, there wasn't any kind of a consent issue and therefore how could it come into the standing question? Well, one thing, of course, it becomes a standing question in light of TransUnion, and so we have to that was not argued to the district court because it couldn't have been. TransUnion hadn't been decided. So what TransUnion makes clear... No, no, but TransUnion doesn't deal with the question of how an affirmative defense comes into a standing issue. In other words, there was an allegation in the complaint, and you did not raise the, the, any notion that this was consented to in any sense. No, we couldn't at that point. You couldn't raise a statutory issue, but you could have raised the question that it wasn't consented to for standing purposes, and that wouldn't necessarily be a statutory consent, right? It would be a free-floating notion that there was some kind of relationship here such that there wasn't an injury, and you never said that. But, but it's standing as a jurisdictional issue that can never be waived. I mean, it can be raised at any point in time. What is the first time, but you're raising it post-judgment, post-verdict, what was the first time the district court had noticed that your client had requested the FCC waiver? Isn't the answer two months after the jury had returned its verdict? That's when, that's when the waiver arrived, but I, I have, I shared the same question. We've got the two months after the verdict, you got your waiver, but when did the district court know you had requested it, and was there a request for a stay? No, the FCC waiver, the fact that the waiver had been made was actually... We know that, and we know the plaintiffs knew about it. Did the district court know about it? Yes, yes. When, when? Well, there was a motion in limine before trial... Counsel, the question is, when did the district court know? I'm sorry? When did the district court know that the... Well, at least by, at least by the time of the motions in limine, and actually, I think it had been discussed in court proceedings... When were the motions in limine? That was a couple months before trial, I believe. It was certainly before trial. Was there ever a request for a stay? I'm sorry? Was there ever a request for, to stay the trial? To stay the trial. There was not. Okay. But either side. I mean, and the Plaintiffs' Counsel obviously knew about this, too, and knew that this result could be incorrect if that FCC waiver came out. What, what, to switch over to the, to the waiver question, what if the FCC waiver had come out a year after the, after there was a final judgment, then what? Why did the waiver come so late? No, what if it had come a year, a year later, rather than two months later? And there was no final judgment, as I understand, at the time the waiver came out. But what if there hadn't? Well, but the FCC waiver came out just after... I know that. I'm giving you a hypothetical. I'm giving you a hypothetical. Okay. All right. Suppose the waiver had not come out until a year after the final judgment. You were on appeal. The waiver comes out. Then what? Do you get to raise it? Well, that, that might be an interesting issue, because you'd have final judgment. But that's not our case. No, but it did come out post-verdict. It came out post-verdict, but not post-judgment. It came out, and that's exactly our point. It came out at a time when the district court still had the opportunity to grant a new trial, still had the opportunity to consider it, and still had an opportunity to present the issue to the jury or to decertify the class. All of that was presented in a, in a time, and with, and with a procedure available to the district judge to do that, to make it right, and the court didn't do that. And so, that's the point, is that the, this was not post-judgment. It's, it's a counter-example. It's, this was not post-judgment. We understand it wasn't post-judgment. So, I have some, a little bit of time left. I know we've run through these issues. I did just want to touch briefly on the... I do have one question for you. Yes. On the waivers. Is your client aware of any requests for a retroactive waiver by the FCC that was ever denied? Um, I am not aware of any. Okay. But, but they can be denied. I mean, in other contexts. So, I guess I'm, I guess I'm back to Judge Kristen's earlier question of, you know, why wasn't the district court told two months before the waiver that Vaisalas had sought a retroactive waiver from the FCC? Well, well, Vaisalas didn't have the waiver. Again, the district court was made aware of this, and I'm sorry, I'll get the cites. Yeah, I'd like to see the cites. I will get the cites for you, but I don't know about all of them. My understanding of the record was that you didn't tell them until after the jury had returned this verdict. No, that's not the case. They did know about the petition. What they didn't know was that the FCC had granted the waiver, because that only became true after the trial. But the district court definitely knew about the FCC waiver. In fact, the plaintiffs argued, and they knew that other companies had been, had received the waivers because, because plaintiffs actually argued, see that, you know, that's not relevant here. That doesn't change anything here, so. It would have been at that time that the district court said, well, you didn't plead an affirmative defense. You need to file a motion to amend your answer to add an affirmative defense. And then there was a discussion with the district court, and I guess the decision was made, we're not relying on consent, so we're going to withdraw our. At that point, right, we didn't have, we didn't have the waiver. We didn't have a basis for pleading an affirmative defense. But if you had put the affirmative defense in, number one, you could have, there would have been a reason for the parties to, and the judge to discuss how the trial would proceed if there was some kind of a consent, affirmative defense, and there wasn't one. Number two, one of the things you said in your brief was, well, we would just have gotten summary judgment against us. Well, fine. See, you would have gotten summary judgment against you, but the issue would have been in the case. And it's not in the case. It wasn't in the case as the case went forward. But I think, clearly, it would have been futile. I mean, under the law. It would have been futile, but it would have been, it would have flagged the issue, it would have preserved your rights, and that didn't happen. Well, perhaps, but I, but there was law that you're not required to preserve, you know, a futile objection. Well, it wasn't permanently futile because you had applied for a waiver, so it wasn't, you were hoping it wasn't going to be futile, and as it turned out, you believe it wasn't futile, so. And isn't it true at that point that some waivers had already been granted to other companies retroactively by the FCC? Yes, and that was exactly the point I was making before, and the plaintiffs knew that and said, that's not relevant here. Remember, the plaintiffs tried to, you know, preclude this and did. Relevant is a big word. It's relevant. I have one question for you before you, I know you want to reserve a little time, and we'll, we will put a couple minutes on the clock for you because we're using a lot of it, but it docked at 3-5-3. The district court set a briefing schedule for your client to file a motion for remitter. It was October 11th, 2019, and the motion that was filed that day was a motion challenging the statutory damages as constitutionally excessive. So did, did you ever file anything that was called or looked or talked about a motion for remitter or is this the motion for remitter? I will have to check on that, Your Honor. Let me challenging statutory damages as constitutionally excessive. Okay. So when you come back, I know you wanted to reserve a bit of time. Thank you for your patience with our questions. When you come back, we'll put two minutes on the clock. Thank you, Your Honor. You bet. Good morning, Your Honors. Aaron Lawson on behalf of the appellees, and I think I want to start with the waiver issue that, that seems to be most central on the court's mind this morning. And I think that's one of them. We'll get to all of them as many as we can. Let us say that not the least of which is the amount of the award here. Well, I'm sure we'll get to that as well. Yes. But I want to, there's, there's one thing that I think needs to be made clear and that's that this order from the FCC doesn't provide some sort of blanket dispensation for the defendant from the jury verdict, right? That's intimated, I think, in the, in the defendant's briefs at least. It is, it is limited in this way. It only applies to consents, written consents received during a particular period of time and only to calls placed during a particular period of time to that same population. Well, that's why I asked the question of opposing counsel as to what evidence was before the district court on that because it sounds to me like there was very little. Well, the answer is none. The answer is none. And, and that's not our, the district judge found, and this is not clearly erroneous, that this was a, a problem of Vaisalas' making. We had asked. But it is their argument, it is the, the premise here is why they want to decertify your class. Yes. Well, so we had asked for all of the records of consent and we were told first that they were irrelevant and then that it was too burdensome to produce them because this wasn't going to be a merits issue. So the district judge. Also that they don't have them, right? That, that, yes, that does appear to be a third point about this as well. So the district judge says at the end of the case when he receives this argument, not going to delve into these factual issues. And what he means is it's impossible to tell on this record how to apply this order to the facts found by the jury because Vaisalas wasn't diligent in preserving its rights with respect to this argument. And, and that's not clearly erroneous. The only way. So that, but the jury found, did it not, that every single call in the 1.8 or 1.9 million calls that were made violated the statute. It, it made, it made no attempt to, uh, to segregate calls that were made to businesses versus calls to cellular, cellular phone numbers and residences. And there was nothing in the record from which the jury could determine what percentage of the 1.8 million were consented to or were the result of voluntarily supplying a phone number. There was, there was nothing in the record on consent. And in fact, the jury was instructed that Vaisalas more than just consent. I'm really asking a broader question of support for the damages award. I mean, you got almost a billion dollars here, um, which, which on the basis of a three day trial on this record seems pretty excessive to me. Well, that, that is the result of the $500 award in the TC. Right. I mean, I understand how they get there. It's simple arithmetic, but it's a lot of it, but it's a lot of it. And I'm looking for evidence to support it. And I'm not seeing much there. I mean, this is almost a runaway jury. Well, so there's, it's a Congress set the $500 number. We get that and we understand that it's a minimum. And so then we know that there's a circuit split on this issue about if you have the, you've read probably more times than we have the stratospheric number. So we, we understand that, but, but, but we are where we are with it. Um, I have the motion filed on October 11th, challenging this as unconstitutionally excessive. The deadline was set by the judge for an opportunity to file a motion for remitted or is it, as to your knowledge, is this the only motion the judge got? That is correct. Yes. Well, is there a difference between a remitted or is usually when you have a non-statutory damages? In other words, when you have damages that are supposedly represented by an actual injury to, or, and so the remitters essentially determination that that was excessive, but here we have a statutory damage. So by making the motion they made, they were making the equivalent of the, there is no remittiture under those circumstances. Well, I don't know that that's true. All I know is that there was a, there was a, they were maybe speaking past each other. I want to make sure I haven't missed anything. You, you have not missed anything. I don't take issue with anything Judge Berzon just said. I just want to make sure this is all he got and that was a deadline for a remitted or he got this motion. That is correct. Okay. So let's get back to the point, which is that this is a monumental number. It's, it's a big number. And there's a circuit split. So, and one of the problems he had is that nobody gave him any, any principled way to reduce this. Right, right. And, and I would make, I think, I think there's two points that are worth making. One, which builds on what we've put in the briefs and another that I think just from the briefs that I want to emphasize. First, Vysalis's, the way Vysalis's argument proceeds is that if each individual who received one or more of these 1.85 million unlawful calls came individually, they would not have a problem with the $500 per call number. And it can't be the case that if they come is merely procedural and we know it can't abridge or enlarge substantive rights in that manner. The other point that I would, I want to make, and I just, this is something I want to emphasize from the briefs, is that we don't yet know how much Vysalis is ultimately going to have to pay out. We don't have financials. Well, I know, but can you back up to the point you were just making? We said it just can't be. The Eighth Circuit, I think, disagreed with that. The Eighth Circuit does disagree. But I can't figure out how they got there. They pick a number. Yeah, I can't figure it out either. Judge Simon couldn't figure it out. There's no. We have a case called Six Mexican Workers v. Arizona. It was not cited in the briefs here. It was cited in the district court. And it was a case in which we did set out a set of criteria for reducing a statutory damage award. And it's a fairly disciplined set of criteria and might work. Now, the difference in that case is that you had a statutory damage award that had a range. And it was within that range that they applied that. But that's a separate question. In other words, in this instance, if we did this, we would be overriding Congress. And it would have to be based on a constitutional notion. But in terms of the availability of coherent criteria, we do have a case that says coherent criteria. Do you think that's not so? Well, I think that the point you've made about there being a range is the reason why we haven't raised this point. There's no range here. And I would point out that there is a range elsewhere. But insofar as you're arguing there are no coherent criteria, that problem, it seems to me, is addressed by Six Mexican Workers. And it does have coherent criteria. So if we were to determine that there is a constitutional problem here, it's just somehow just too much. The Eighth Circuit has no criteria. But our circuit does have a well-thought-out opinion that has criteria. Is that right? Well, I agree that it is a well- thought-out opinion that has criteria. I read it as setting forth criteria to determine where you fall within a statutorily prescribed range. If we had a claim under 227C under the TCPA, there is a range there that's an up to 500. This is just 500 or 1,500. But the 500, you know, I was thinking about this in terms of my extreme annoyance when I get these phone calls, right? Is it $500 worth of annoyance? Probably not. Congress thinks it is. Mine is. But that's to say that the $500, and Judge Easterbrook's opinion in the Seventh Circuit recognizes this in another context, really includes a deterrence for punitive peace. Yes, yes. And so if it does include a punitive peace, then one would think that in some way is or is not completely divorced from the Supreme Court's restrictions on punitive damages. In other words, what you're aggregating is both a damages peace and a punitive peace. And as you're aggregating the punitive peace to more and more money, it does start to feel like punitive damages. It isn't punitive damages exactly because it's not And there is some argument, it seems to me, for some constitutional aggregating limit on it. Well, I think the TCPA, the $500 per call, that is definitely a deterrent. There's a deterrent function there. And Williams, the Supreme Court case, tells us that that's a perfectly valid reason for Congress to set damages in a particular amount. I think the $1,500 is the punitive part. And the district judge, I think, recognized that that wouldn't be appropriate. Well, I thought the statute was it's either a minimum of $500 or, if you can prove out-of-pocket damages like Judge Christensen's emotional damages for receiving these awards, then you get the higher number. But if there is no evidence of that, then you get at least $500 per call. I think it's exactly $500. If you prove a willful violation, you can treble the damages. No, but you can get actual damages. You could get actual damages, yes. I was thinking, you're running to catch this call, you drop the baby. So maybe you get damages. Yeah, you can get actual damages. Obviously, there become issues for class certification if you're pursuing actual damages. There's a statutory award, so we don't need to worry about any of that. But to return, I think, a point related to your six Mexican workers point, we're going to have to have a claims process. And experience shows we're unlikely to get 100% claims rates. So there will be a residue. But if I'm not comforted by that, and I'm still concerned that this is just too big, if I find that persuasive, I'm not sure I do, by the way. I don't think I've ever seen one like this where Congress has set a floor, and it is just the multiplier. But if that seems to be concerning, do you have a great idea about the best next step? Because the district court felt he didn't have any guidance. Do you think it should be some kind of application of our existing case law? It would have to be adapted, I think. That's the best answer. I'm not sure it's particularly satisfying since Congress set a particular award here. And I think that's a very good reason why the Eighth Circuit's rule, which isn't supported by a whole lot of reasoning, is just wrong. This is a fairly unadministerable rule to just sort of, in an ad hoc way, chop statutory awards down. There's not a basis for that in present, or in the Constitution, for that matter. So, if I could return to the waiver, unless the standing issue is detaining me. Go ahead. Sorry. So, we have a dearth of evidence that would allow us to apply this FCC order to the existing jury verdict. And so, to apply it here requires us to redo discovery and to redo trial. And I think the district court said, look, this is, you had a chance to preserve your rights here to create a record. You didn't take it. Not only did you not take it, but you affirmatively said you weren't going to be doing so. How would they have created a record? I mean, they could have... There's no way this evidence would have come before the jury. Likely no. Well, I'm not sure about that. This goes back to, I'm not sure this distinction was made. And I would welcome you to answer that question as well. But let's say it was. And apparently, according to opposing counsel, at least by the time that the motion eliminated, the judge knew the application had been made. Yes. So, was the waiver that your client received any different than the nine other entities? Sorry, other. Waiver issue here, different than the nine other waivers? It was not. So, that would have been a pretty good guess. Yes. Right. Well, and this is another point, a related point. Forgive me, but so if someone had said, hey, this is pending and we'd like a stay, then that may have been granted or it may have been denied. But there also may have been, getting back to Judge Berzon's point, there may have been a way to fashion the instructions to the jury differently. I don't know. And the reason I don't know is because the dearth of discovery is that if you had told me that you had this evidence and that you had asked for this waiver with enough lead time and you'd proposed this, we could have put questions on a special verdict form and asked the jury to make these findings so that we could apply them in the event you received this waiver sometime before we enter judgment. And that didn't happen. And of course, he has a very wide discretion with fashioning a special verdict form. So, what could he have done at that time? If he had said, yes, we may get this at any minute, and he didn't want to burn a jury. So, at that point, he's got them ready to go. Would there have been a special verdict form that could have been fashionable where this could have been preserved in the way that Judge Berzon suggests? That's, I think, an unanswerable question. Well, because of the absence of discovery, it's hard to know exactly what we would have asked. Well, it sounds like your answer is no. That's what I'm trying to get at. If you didn't have the discovery, I don't know how you would fashion the special verdict form. Right. Exactly. I mean, his point about the special verdict form is premised on the idea that when we asked for these records in discovery, we would have received them, and there would have been a record to work off of. But there simply is not. And so, as he— In this case, then, I think you are back to Judge Berzon's point, which is what could they have done? Well, produce the records. You know, we asked very early on. But by this point, you're—under our hypothetical, by the time the judge knows about it, it's a couple months before trial. Well, but they had taken no steps to preserve their rights up to that point. The fact that they were out of options at that point is a result of their failure to participate in discovery for the two to three years prior to that. And so, this is why the district judge says, you haven't been diligent. And I don't think that's a clearly erroneous finding at all. And the fact that we'd have to redo discovery and redo trial, that's—I mean, that's classically recognized as prejudice to the opposing party when you want to raise it. Well, are the forms even available? My understanding from reading the record was that one of the problems was that they couldn't produce all the applications. That is what we were told. I think it is unclear, right? During discovery, they pointed to a single unfilled form. They said, this is what people would have filled out. This is a typical form. Yes. And then when they moved to decertify the class and for a new trial with this order in hand, they produced five or six other forms. So, the record is totally unclear at this point. Five or six out of 1.8 million. Well, there's an assertion that many people—and again, we don't know how many. Right. We don't know if they're the people who received the 1.85 million phone calls, would have filled out these forms. Now, the main plaintiff in this case had severed her relationship with this company before. Yes. And I think actually most members of the class had as well because a large portion of these calls were calls to try to bring people back into the organization. So, the argument that they had consents at that point from people who were no longer customers or members seems—I mean, it was another thing, I suppose, that would have to be litigated, but I don't understand when somebody has withdrawn from the company that anything they have consented to is contractual on their gods. Yeah. Just briefly before I sit down, now that I'm out of time, I'll just respond to that. This is another issue that would need to be litigated on remand. Now, the rule, the consent rule that Vaisalas is pushing here is one based on FCC interpretive rules, and we know now that these are not binding. We had treated them as binding until very recently, and the FCC has attempted to substitute an implied consent regime for the express consent regime required by statute, and I think we would argue, and we have a very strong basis to do so, that at no point did Vaisalas have the express consent that's required by statute, so even if we redid this— What do you mean they're not binding? Say that again? What do you mean by they're not binding? Well, in prior decisions, prior to the Supreme Court's PDR network decision, it had been the position of this Court, and I think of every single court of appeals, that you couldn't question statements by the FCC in these interpretive orders, and now we know that interpretive statements, statements that merely set forth the FCC's interpretation of the TCPA, are not binding in that manner, and this particular statement is unworthy of deference, this idea that simply providing a phone number, especially since these people had the opportunity to ask to be called in other ways, or asked to be contacted in other ways, that's not express consent, and I think we would argue that. Well, it certainly isn't express consent to robocalls, because nobody ever asked about robocalls. Exactly. That would be our position, and if the Court doesn't have any further questions, I will sit down. Thank you, Your Honor. Thank you. Good morning again. I'd like to respond quickly to the Court's previous question about the document. Oh, thank you, thank you. Yes, 358 is the docket number for the document in which we argued, we made a motion to reduce the damages, and so it is included in the excerpt of the record. I have it right here. I was just trying to make sure this is all you filed, and you've answered the question, so that's fine. Could you, you didn't argue at all in your opening argument about the damages question. Could you give us succinctly what your position is? That is, what is the constitutional violation, and how would, what would be a rubric or a way to structure any determination as to what the damages would be if we were to look at the aggregate damages? I understand that you're only challenging the aggregate damages, not the $500. Right. Okay. What's the rationale for doing that? If the $500 are okay, what's wrong with the aggregation? Well, as the Court, as the Eighth Circuit held in Golan— It didn't hold much of anything. It just kind of had nips and jigs it. Well, the Court did look at the Supreme Court standards, and basically what we're saying is you do have to look at it from a constitutional standpoint and look at whether this aggregate award is disproportionate, is unconstitutional because it is grossly disproportionate. Well, it's not disproportional because it's measured one by one, is proportional to each violation. So it can't be disproportionate unless you think the $500 is disproportionate. Well, but I think you do have to look at the aggregate because you do have to look at the effect on— Can I back up and ask you to, you know, the Eighth Circuit reached that result, and there really isn't reasoning there. I share Judge Berzon's frustration, but I wondered if it was a product of an argument that was made. Was there a methodology argued to them that they adopted in the briefs in the Eighth Circuit case? I'm not sure, Your Honor, but I do think they relied on the old Supreme Court case in Golan, which focused on the—made the point that if it's severe and oppressive and disproportionate— Well, that's how you figured if it's too much, but I'm trying to figure out how they ratcheted it back and what their formula was, and whether a formula was offered to them, and it sounds like you're not familiar with one. I'm not sure what was offered to them. Fair enough. They were reviewing a district court that had already done this, so they were, you know, it seems like kind of an abusive discretion review type thing, which is what they were doing, but there are two related questions. One is, what is the reasoning for finding that you can—where Congress has made a determination as to the amount per violation, and all you're doing is multiplying, that we have the authority to change that result under the Constitution, and why? I know the Eighth Circuit did it, but it didn't explain how or on what rationale it's doing. Right, and then perhaps this Court can do a better job of setting forth the rationale. I know, but I need you to tell me what the rationale would be. Yes. I think the Court hit on it earlier in discussion with opposing counsel in the analogy to punitive damages, so I think— But the problem with punitives are they're—it's sort of whatever the jury thinks should be sufficient to punish the defendant, and here we have a congressional determination that the penalty for an unsolicited call is $500, and if it's a really aggravated situation, up to $1,500. In punitive damages, the sky's the limit. Well, but it's not, right? There is a constitutional limit on punitive damages. These aren't punitive damages in the same way, and there's other circuits that have said that that's an apples and oranges comparison. Well, it's not— Maybe another way to answer Judge Berzon's question is why is Judge Easterbrook wrong? He just says it is the simple math. Congress has decided. The problem is there's 1.8 million of these calls in your case. That's what a jury decided anyway, and so what do we do with that? What's your best shot? Right. Well, because I think we do have to look at the aggregate harm in the sense of what impact that had on this company. This company, privately held, small company, it's a death knell. It would be a death knell for pretty much any company. That's a punitive damages analysis, and there are some times when there is bet the company litigation and companies lose, so I'm not too persuaded by that. Is there—and I don't mean to make light of it. It's just that that's not a unique circumstance, so what else do we do where Congress has said this is the number? To put it slightly differently, if we're going to rule in your favor, give us an analytical guidepost here by which we can articulate why the award should be reduced dramatically from $1 billion. Again, I think you have to look at the severity, and maybe we just have to go back to the Supreme Court's language, severity, oppression, the oppressiveness of the verdict. But even if we reduced it to 10%, that would still be $100 million, which may be ruinous to Vice Alice. So what do we look to? What's the analytical framework that we can articulate to give district courts some guidance on what to do if they find themselves in this? I think one question needs to be, what would be an award that would not kill this company? That, of course, is the one thing that Judge Easterbrook said, you don't— And you didn't put in any evidence of the financial net worth of this company, so at this point, we'd be shooting in the dark. Right. Well, I think that the district court just didn't consider the issue, and I think the court does need to consider the constitutional overlay on this matter. And it basically said, I just don't have any basis to do it, or I don't have any structure. So I do think that the court needs to make clear that the district court, in this case and other cases, does need to look at the constitutionality. And I don't think it is so different from punitive damages. This is a penalty, a statutory penalty. Well, is it a penalty? Well, kind of a shock to the conscience of the court standard, is that what you're— Well, no, no. And it's not a perfect analogy, but I guess it is punitive in that sense, and it is very much sort of like a criminal sentence in some senses, too. Is there any legislative history or— Any basis for where the— Well, first of all, you're not challenging the $500. Once you're not challenging the $500, I think you've got a problem in articulating constitutional theory, because you have to be saying that the $500 includes a punitive amount, right? Otherwise, you're nowhere.  So you're not challenging the $500. Another thing that Judge Easterbrook's opinion did was try and break down within the statutory amount what was punitive and how you would look at that if it were a punitive damages analysis. You haven't done that either. I mean, you haven't suggested any way to look within that $500 as to what's penalty and what's not penalty. So once you don't do that, then we have kind of a black box $500 that's just being multiplied. Well, it is, and I think that's telling, because there was no evidence from the plaintiff's part of actual harm. So it's all punitive. I mean, the $500 is all penalty. So this is all penalty. Oh, wait a minute. No, it isn't. It's at least a large part of some notion of liquidated damages. I mean, at most, I would think there would be nominal damages here. Maybe it's a dollar, a nominal damage. Nominal damages that Congress picked was $500. Okay. And if it's an aggravated case, then you can triple it. There's a punitive element if you want to find one, but the jury didn't find anything more than $500. Right. And even without the penalty, even without the willful violation evidence, this award is astronomical. And I do think it, I mean, honestly, I do think it should shock the conscience. I mean, it really— Counsel, you're way over time. Yes, I am, and I apologize. Don't apologize. It's our questions, but I just would like you to wrap up. Yes. Just to bring this home, I think that damages bring to light one thing that has to be considered, which is the absence of harm here. And this is where I started. There is not a concrete harm here, and for that— But most people who are in their houses and get these telephone calls feel harm. But these people remember— And there is a historical basis for that. And your argument is that Van Patten, this is different because people, you think, consented or gave their phone numbers. And how did the main plaintiff, who hasn't had anything to do with the company for three years and withdrawed from it, consent to anything? In Van Patten itself, the court said that was still consent as a matter of law. Once the—if you look at the substantive holding— Well, wait a minute. That was statutory, but that doesn't make it a constitutional non-injury. Well, if anything— I mean, there's a different—excuse me. If you're going to try to separate out the constitutional injury from the statutory one, then you have to do a whole hog in both directions. And you can't say because there was no—even if there was no statutory—even if there was statutory consent, she still says, I didn't want these phone calls. They were unwanted, and I didn't mean to agree to them. And that has to be a constitutional injury, whether it's a statutory injury or not. Right. But I think in this case—but there's no evidence that any of these class members didn't want the phone calls. In fact, they were sales representatives. But wait a minute. They weren't. A very large percentage of them, maybe two-thirds, had already left also. Well, but again, I mean, if that's consent as a matter of law under Van Patten, there's—you know, that they did not—just withdrawing from your membership isn't enough to withdraw the consent. If I let you continue, at some point he's going to get back up. Fair is fair. I can wrap up, Your Honor. Please. The court has no further questions. I'll just ask the court to consider the serious issues in this case, and particularly the damages. Believe me, we are considering the serious issues. Yes. Thank you both for your arguments. We appreciate them very much. We'll take this case under advisement.
judges: BERZON, TALLMAN, CHRISTEN